**BRICKMAN–JOY CORPORATION and Connecticut Galvanizing Corp., Plaintiffs-Appellees,**

v.

**NATIONAL ANNEALING BOX COMPANY, Defendant-Appellant.**

**No. 545, Docket 71–1454.**

United States Court of Appeals, Second Circuit.

Argued March 2, 1972.

Decided April 3, 1972.

Philip S. Walker, Hartford, Conn. (Robert B. Titus, Hartford, Conn., on the brief), for defendant-appellant.

Brandon J. Hickey, Hartford, Conn. (Lewis Segal and Lynn A. Brooks, Hartford, Conn., on the brief), for plaintiffs-appellees.

Before MURRAH,* KAUFMAN and OAKES, Circuit Judges.

OAKES, Circuit Judge:

This diversity action under Connecticut law, involving the failure of a galvanizing kettle, was submitted to the jury on the basis of an implied warranty of merchantability, Conn.Gen.Stat. § 42a–2–314 (1958) (Uniform Commercial Code), and judgment was rendered for plaintiffs. Defendant brought this appeal from Judge Blumenfeld's denial of its alternative motion for judgment n.o. v. or a new trial under Fed.R.Civ.P. 50(b). We affirm.

Plaintiffs-appellees, Connecticut corporations, ordered a $7,000 galvanizing kettle [1] from defendant-appellant, a Pennsylvania corporation. This was to be manufactured by defendant-appellant in accordance with the inside dimensions determined by appellees but the specifications prepared by appellant and accepted by appellees. On delivery of the kettle at appellees' Glastonbury, Connecticut, plant, they placed it in their furnace setting, a recessed pit. On the kettle's maiden run, however, while packed with zinc and heated to approximately 820° F., it cracked open in or near a weld between the bottom and side plates. Needless to say, the molten zinc within dribbled out.

The wounded kettle was then hosed with water—in the trade, "frozen"—to solidify the bleeding zinc and inhibit further leakage. Vermiculite was also spread on the top layer of zinc in the kettle to prevent the remaining zinc from losing too much heat. After deliberating several hours, appellees' managers concluded that to salvage the remaining zinc, the best course would be to reheat the kettle to melt the zinc so that it could be pumped out of the kettle. Upon reheating, however, the crack in the kettle apparently lengthened, the bottom of the kettle dropped out, and the molten zinc spilled all over the pit.[2]

---

* Senior Judge of the Tenth Circuit Court of Appeals, sitting by designation.

1. Galvanizing is the procedure in which steel products, after having been pickled in acid to eradicate impurities, are dipped in and coated with molten zinc to inhibit rust. A galvanizing kettle is nothing more than a large bathtub which holds the zinc while heat from an external source is applied to raise the temperature of the zinc over its melting point to galvanizing temperature of about 850° F. The kettle in this case was 30 feet 6 inches long, 4 feet wide, and 7 feet deep, holding between 173 and 186 tons of molten zinc when filled.

2. A strikingly similar, if much more devastating, incident in another New England

Appellees sustained over $80,000 in damages in retrieving the zinc and replacing the kettle.

The court below found, as appellees claimed, that there was an implied warranty of merchantability as a matter of law. The case was then submitted to the jury only on the question whether there was a breach of that implied warranty. Appellant contests the propriety of the court's instructions, claiming that the charge should have been based, if on any warranty, on the implied warranty of fitness for a particular purpose [Conn.Gen.Stat.Ann. § 42a–2–315 (1958)].

Appellant's specific argument is that the warranted product—the kettle—could have been used in galvanizing operations only in conjunction with numerous other components and design varia-

bles over which appellant had had no control. Therefore, the argument runs, the case fell outside the realm of simple merchantability, which appellant interprets as being limited to products suitable for general use without modification or adaptation to particular circumstances.[3]

Inasmuch as the elements necessary to support a warranty of merchantability were present in the kettle transaction,[4] and since within the component system, only the kettle precipitated the damage, appellant's position is untenable. Appellees purchased a galvanizing kettle from a kettle merchant and were entitled to presume the kettle was of merchantable quality. Fitness for a particular purpose need not be reached here, for as Judge Blumenfeld concluded, "[I]n the instant case, the

---

state is recounted as follows in the March 1972 issue of Scientific American, at 44:

> Spectacular failures are not unknown in the history of engineering, but none is more spectacular, in a peculiar way, than one that happened in the North End of Boston, Mass., on January 15, 1919. . . .
>
> The U. S. Industrial Alcohol Company, a distiller and supplier of raw alcohol to the munitions industry, was the owner of a large molasses storage tank . . . . Made of half-inch steel plates supported by a heavy concrete foundation, the tank was 58 feet high, 282 feet in diameter and had a capacity of 2.5 million gallons.
>
> Shortly after noon on January 15, . . . the tank ruptured with explosive suddenness, its rivets popping out like a fusillade of gunfire. A moving wall of molasses was released; it traveled through the area at 35 miles per hour, sweeping away everything in its path. One two-and-a-half-ton section of tank wall, 400 square feet in area, was deposited 182 feet away from the tank base. A nearby firehouse was pushed off its foundations by the viscid flood and almost swept into the harbor. Another structure was carried down the street until it collapsed; in still another house the molasses mounted to the third floor, rousing a sleeping man. Where the advancing molasses struck the girders supporting an elevated railway it collapsed them; an approaching train was halted just in time. By

> nightfall 11 dead had been found and 60 injured had been taken to hospitals. . . . A series of investigations, as well as legal maneuvers concerning liability, dragged on for years before it was finally discovered that the steel of the tank's wall plates had been considerably thinner than the specifications required. When this fact emerged, . . . the company settled all claims out of court. The incident was closed except it is said that, when weather conditions are appropriate, one can still detect the scent of molasses in the North End.

3. Appellant's argument would have relieved it of liability, in that one of the requirements of warranty of fitness for a particular purpose was clearly lacking from this transaction, viz., that the buyer rely on the seller's skill and judgment to furnish a suitable product. Here appellees informed appellant of the inside dimensions desired, not the design features of the facility. Appellant was not asked to furnish a kettle compatible to a design or for a particular purpose. See Conn. Gen.Stat.Ann. § 42a–2–315 (1958).

4. It is not controverted that appellant was a merchant with respect to galvanizing kettles, see Conn.Gen.Stat.Ann. § 42a–2–104(1) (1958); that a contract for sale existed between the parties, see Conn. Gen.Stat.Ann. § 42a–2–314(1) (1958); or that appellant made no disclaimer of any implied warranty. See Conn.Gen. Stat.Ann. § 42a–2–314(1) (1958).

general purpose and the particular purpose of the item sold were one and the same—galvanizing. [T]hat the kettle was manufactured to meet the requirements of plaintiffs' galvanizing operation rather than someone else's galvanizing operation does not make inapplicable the warranty of merchantability." Ruling on Motion for Judgment N.O.V. or for a New Trial at 2, Brickman-Joy Corp. v. National Annealing Box Co., Civil No. 12,965 (D.Conn., filed Feb. 26, 1971) (hereinafter cited as Judgment). *See* Crotty v. Shartenberg's-New Haven, Inc., 147 Conn. 460, 464, 162 A.2d 513, 515 (1960).

Appellant additionally seeks to convince us that the trial court erred in instructing the jury as to what would constitute misuse of the warranted product by the buyers, thus defeating the merchantability claim. At the trial, appellant's principal allegation was that the kettle failed because plaintiffs neglected to brace it in their furnace setting with side supports. That omission, appellant claims, was a misuse of the kettle which ought to relieve appellant of liability.

Judge Blumenfeld instructed the jury that the plaintiffs had the burden of proving that the kettle was not fit for normal use and that plaintiffs' use was not misuse. He further charged, with respect to the standard for determining misuse:

> If the manner in which the plaintiff used the kettle was *in accord with practices employed by an appreciable number of galvanizers* in April of 1968, when this occurred, you may then find that the plaintiff is entitled to the benefit of the warranty of merchantability and is entitled to recover, even if not all galvanizers would have used the kettle as the plaintiff did.
>
> · · · · · · ·
>
> . . . That does not mean that in order to avoid being charged with misuse he would have to use the kettle in the best way that galvanizers use it. He wouldn't have to use it in the way that most galvanizers use it. He wouldn't have to use it in the way

that it's regarded as the best practice. If he used it in a way that's used by an appreciable number of galvanizers, people in this industry, then that warranty stands; that was not a misuse of the kettle. [Emphasis supplied.]

Taking exception to the "appreciable number" standard, appellant urges that under Silverman v. Swift & Co., 141 Conn. 450, 107 A.2d 277 (1954), the Connecticut test for misuse is whether the plaintiffs followed "commonly used precautions" when using the kettle in their galvanizing operation. The undisputed proof that plaintiffs did not provide side supports, the theory obviously follows, would lead the jury to bar recovery if they were convinced that such supports were a commonly used precaution in the galvanizing industry.

The "appreciable number" standard was fashioned by Judge Blumenfeld, in the absence of more definitive Connecticut law, from Crotty v. Shartenberg's-New Haven, Inc., *supra*, a hair remover warranty case. There the court said that while the plaintiff could not recover if the injury were caused "by reason of his own improper use of the article warranted," *id*. at 467, 162 A.2d at 517, citing Silverman v. Swift & Co., *supra*, the warranty of merchantability would stand if plaintiff could show that the product "can affect injuriously an appreciable number of persons." 147 Conn. at 467, 162 A.2d at 516. *See also* Corneliuson v. Arthur Drug Stores, Inc., 153 Conn. 134, 214 A.2d 676 (1965). On this foundation Judge Blumenfeld wrote:

> If the *Crotty* rationale for not relieving a manufacturer from liability to an appreciable number of buyers who react other than the ordinary person is valid, the same reasons apply with equal force for holding that he is not relieved of liability to one who uses the article in a way that an appreciable number of buyers would use it.

Judgment, *supra* at 5.

The *Silverman* case was interpreted by Judge Blumenfeld as not inconsistent

with, but as supportive of, the "appreciable number" standard. In that case the warranty of merchantability was held applicable to a sale of food generally "only when the food is used in the usual, rather than in an unusual, manner," 141 Conn. at 457, 107 A.2d at 280–281, and in the case of raw pork particularly, only if the pork "has been cooked with the commonly used precautions prevailing among the general public." *Id.* at 458, 107 A.2d at 281. Since the *Silverman* court had emphasized that it could be judicially noticed that raw pork must be cooked thoroughly to prevent trichinosis, Judge Blumenfeld found that in raw pork cases there is an equation of use in the "usual" manner on the one hand and "the commonly used precautions prevailing among the general public" on the other. He concluded:

> Where products, even food products, other than raw pork are involved, the [*Silverman*] case can only be read to stand for the proposition that a warranty will not cover an 'unusual' use of the product. The *Crotty* test of 'appreciable number' of users can then be used in the 'misuse' context to provide some guidance to the meaning of 'unusual.'

Judgment, *supra* at 6.

■ We do not and cannot find Judge Blumenfeld's synthesis incorrect. The instructions in this case necessarily had to impart to the jury that the plaintiffs could not recover if the damage were incurred through their own improper use of the article warranted. Crotty v. Shartenberg's-New Haven, Inc., 147 Conn. 460, 467, 162 A.2d 513, 517 (1960), citing Silverman v. Swift & Co., *supra*. The inquiry, therefore, had to be what were the ordinary ways in which galvanizing kettles were used in the galvanizing industry, for an ordinary or usual use would not be an improper one. Application of the "appreciable number" test satisfactorily would determine the ordinary practices in the industry. The question was whether plaintiffs had used the kettle ordinarily and properly, saving their claim, therefore, or had used it unusually and thus improperly, barring recovery through misuse.

Two things might be said about the "commonly used precautions" language of *Silverman*. First, the appreciable number test would reflect any such precautions, since the degree of commonness as stated in *Silverman* could be noticed judicially and would by definition be used by an appreciable number of purchasers of manufactured products. Second, and more importantly, a manufacturer who is or should be concerned that his product must be strengthened by external supports to be made operable for its intended purpose, has both the power and prerogative to disclaim liability should the product be used without such supports. It is not unfair to put the onus on the manufacturer when an appreciable number of buyers use his product in a manner he may consider dangerous.

We do not think in this diversity case, especially in the absence of any clear, closely parallel Connecticut precedent, that the district court's view of local law may be lightly disregarded. *See* Wasik v. Borg, 423 F.2d 44 (2d Cir. 1970); Deveny v. Rheem Manufacturing Co., 319 F.2d 124 (2d Cir. 1963). We consider Judge Blumenfeld's instruction as to misuse proper and fair, and we accordingly approve it.

Appellant's final contentions are that the court's instructions regarding the plaintiffs' duty to mitigate damages were erroneous, and that the court improperly summarized the evidence with respect to mitigation. Our reading of the record, however, reveals that the instructions clearly portrayed the law, *see* Morro v. Brockett, 109 Conn. 87, 145 A. 659 (1929), and that the court's recollection of the evidence was fair to both parties.

Judgment affirmed.